IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*



| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:24-cr-31-1 |
| MEISHA THOMPSON, | |
| Defendant. | |

### STATEMENT OF FACTS

The United States and the defendant, MEISHA THOMPSON (hereinafter "the defendant") agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

#### Background

1. Unemployment Insurance ("UI") is a joint state-federal program that is intended to provide temporary financial assistance to unemployed workers who are unemployed through no fault of their own. The Virginia Employment Commission ("VEC") is responsible for administering the unemployment compensation program in Virginia. Prior to the expanded benefits described below, eligible recipients received a minimum of $158 per week in traditional unemployment benefits.

2. In March 2020, the United States was in the midst of the coronavirus ("COVID-19") pandemic, which resulted in the shutdown of numerous businesses and caused millions of American workers to be out of work. On March 13, 2020, the President declared a national emergency under Section 501 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121 *et seq.* ("Stafford Act"). The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. The CARES Act

1

dedicated $250 billion to expand states' ability to provide unemployment insurance for many workers impacted by the COVID-19 pandemic.

3. Two of the principal ways in which the CARES Act expanded unemployment benefits during the pandemic was by (1) making those benefits available for those who had not traditionally qualified, such as contractors, self-employed, and gig workers, and (2) substantially increasing the amount of money paid to those who qualify for unemployment benefits. Based on this change in eligibility, the VEC had to rely on and trust the information provided by the claimant as the VEC could not quickly verify the information as it had done with more traditional employment relationships. In an effort to ensure that workers who were unemployed due to the pandemic received their benefits in a quick manner, the VEC processed and paid out these claims shortly after the claims were submitted.

4. As of April 18, 2020, the President had declared that a major disaster existed in all States and territories under Section 401 of the Stafford Act. On August 8, 2020, to further offset the pandemic's impact on American workers, the President authorized the Federal Emergency Management Agency ("FEMA") to expend up to $44 billion from the Disaster Relief Funds for unemployment benefits. The President authorized the FEMA Administrator to provide grants to participating states, territories, and the District of Columbia, including the Commonwealth of Virginia, to administer delivery of last wages assistance ("LWA") to those receiving unemployment insurance.

5. The VEC divided the unemployment compensation program into the following four components based upon the CARES Act and the FEMA LWA authorization: (1) Federal Pandemic Unemployment Compensation Program ("FPUC"), which increased unemployment benefits by $600 per week; (2) Pandemic Unemployment Assistance ("PUA"), which expanded

2

unemployment benefits for individuals who did not qualify for traditional unemployment benefits, including the self-employed, independent contractors, and gig workers; (3) Pandemic Emergency Unemployment Compensation ("PEUC"), which provided up to 13 weeks of unemployment insurance benefits to those who exhausted their eligibility; and (4) LWA, which provided an additional $300 per week in unemployment benefits. For claimants in Virginia, LWA was automatically paid out in one lump sum of $1,800 on or about October 15, 2020, covering the time period between July 25, 2020 (when the $600/week PUA benefits expired) and September 5, 2020, so long as the claimant had certified unemployment eligibility during that time period.

6. To qualify for PUA, applicants first had to apply for traditional unemployment benefits, be denied, and then file a new application for PUA benefits. Unemployed workers did not file separate claims for PUA, FPUC, and LWA benefits. Rather, an existing approved PUA claim resulted in automatic approval for and payment of FPUC ($600 per week) and LWA ($300 per week) benefits.

7. The VEC accepted unemployment claims on an online portal. The VEC application for an unemployment claim required entry of personally identifiable information: name, date of birth, Social Security number, physical address, and phone number. It also required answering a series of questions to verify eligibility, such as the claimant's work history, name of the employer, reason for separation, whether the claimant was ready, willing, and able to work, and, to qualify for PUA, whether they lost their job due to the COVID-19 pandemic.

8. Once the VEC approved a claim, claimants must recertify their unemployment status on a weekly basis to continue receiving payments. The claimant must certify that they are ready, willing, and able to work each day during the weeks they claimed unemployment. Both

3

initial applications and weekly recertifications were attested to as truthful under penalty of perjury.

9. Successful applicants could choose whether to have VEC deposit their unemployment benefits directly in a linked bank account, or loaded onto a prepaid debit card (called "Way2Go" cards) that was shipped to the applicant via the United States Postal Service ("USPS") or a private or commercial interstate carrier to the physical address listed on the application. For applicants who choose a debit card, a Personal Identification Number ("PIN") for the card was sent to the address listed on the application in a separate mailing. Prepaid debit cards were automatically reloaded with newly disbursed funds via electronic transfers using the Internet. These prepaid debit cards were specific to each unemployment beneficiary, and were marked with the beneficiary's name and a unique account number that links the card to the beneficiary's unemployment benefits.

10. In or around June 2020, VEC began reviewing claims to identify potentially fraudulent claims. By August 2020, VEC officials had learned from other states that inmates in correctional facilities were receiving benefits. Incarcerated individuals are neither available for employment nor able to seek full-time employment. Further, these individuals were unemployed due to their own criminal conduct and not due to the COVID-19 pandemic. For those reasons, they were not eligible to receive unemployment benefits, including PUA, LWA, and FPUC. VEC obtained a list of inmates housed by the Virginia Department of Corrections ("VADOC") and cross-referenced the list with unemployment claims. In November 2020, VEC froze claims found to have been made using the personally identifiable information ("PII) of known VADOC inmates.

11. During the scheme and conspiracy to defraud, Dedrion Short was a VADOC

inmate incarcerated at Buckingham Correctional Facility in Dillwyn, Virginia. The defendant resided in the city of Virginia Beach, Virginia.

## The Conspiracy and Scheme to Defraud

12. On or about May 4, 2020, the defendant applied for unemployment in her own name. VEC approved the claim and paid her a total of approximately $10,922. On a recorded call on or about June 18, 2020, the defendant's boyfriend, R.C., who at that time was incarcerated at the Deerfield Men's Work Center in Capron, Virginia, asked the defendant about "they" giving 7 or 8 grand away. She asked if he was talking about unemployment, which he affirmed. After R.C. expressed interest in having a claim filed using his PII, the defendant initially expressed concern about R.C. being in jail and having to create a bank account for him and answer security questions. However, she said they should try to do it because "they definitely giving money out to everybody." Using R.C.'s PII, which he had provided on the call, the defendant fraudulently completed and submitted an application to VEC for UI benefits, which caused delivery of a Way2Go debit card with UI funds and later payment of LWA funds, resulting in disbursement of approximately $16,898 in VEC funds to which neither the defendant nor R.C. were entitled. Rather than accurately report R.C.'s address at Deerfield, the defendant listed R.C.'s physical address as her own address so that the debit card was mailed directly to her in Virginia Beach, Virginia.

13. After successfully filing the claim for R.C., the defendant began obtaining the PII of more inmates via Lemyron Hawkins, with whom she was in a romantic relationship, in order to file more fraudulent unemployment claims for inmates. In a recorded phone call on June 24, 2020, Hawkins told Dedrion Short, his half-brother, to recruit other inmates of the VADOC to provide their PII to Short. Short did so, and went on to provide Hawkins and/or Norman

DeLoatch the PII, including names, dates of birth, and Social Security numbers, of dozens of VADOC inmates over recorded jail communications. After getting the PII from Short, Hawkins and/or DeLoatch would provide it to the defendant, who ultimately filed fraudulent UI claims using the inmates' names and PII. For instance, on or about June 24, 2020, the defendant filed two fraudulent UI claims: one on behalf of C.J., and one on behalf of Short. C.J. was an inmate at Buckingham with Short.

14. For the unemployment applications to be successful, the defendant had to provide numerous false inputs in required fields on the VEC website. This included a false physical address, telephone number, email address, and most recent employer. The UI application requires entry of at least one "employment history." For each application, the defendant provided false information pertaining to the applicant's last employer, including a certification that the applicant worked "at least 30 working days" for the employer, the date on which the applicant began working for the employer, the last day worked for the employer, and the reason for separation.

15. The defendant falsely certified that the inmates were unemployed through no fault of their own due to the COVID-19 pandemic and that they were ready, willing, and able to work. The defendant elected for many of the UI benefits to be paid through a preloaded Way2Go debit card that was mailed to the physical address she listed on the application. The physical addresses for many of the inmate UI claims were either identical or very similar, and no application accurately used the address of incarceration. The selected security question and answer thereto followed a similar pattern across several UI claims, namely, the defendant selected as the security question "What is your mother's maiden name?" and provided as the security response the last name of the inmate-claimant. Likewise, the chosen username for the VEC portal

followed a similar pattern across several UI claims, namely, the last name of the inmate-claimant followed by the two- or four-digit year of the inmate-claimant's birth. For each of the inmate claims, the inmates' dates of employment, as reflected on their UI claims, coincided with their dates of incarceration.

16. The defendant repeated false recertifications on a weekly basis to ensure that UI benefits would continue to be paid. For many of the inmate claims, she continued weekly recertifications through in or about November 2020, when VEC cut off UI claims known to have been made on behalf of inmates. The latest weekly recertification for an inmate claim took place on or about November 2, 2020. For each successful claim, the VEC typically paid over $15,000.

17. On a recorded phone call on July 8, 2020, the defendant told R.C. that she needed to set up email accounts because she planned to file UI applications for eight people. The defendant said that she submitted five applications while she was at work.

18. The defendant elected for most of the UI benefits to be paid through a preloaded Way2Go debit card, which was mailed to the physical address listed on the application — either the defendant's residence or other residences that the defendant selected to avoid suspicion that would have arisen from too many cards going to one address. On a recorded jail call on July 8, 2020, the defendant told R.C. that she was on the way to her cousin's house to see if one of the cards arrived in the mail. The defendant further stated that she hoped that her cousin knew that the defendant was going to send "two more" to her house. The defendant said she had five going to her cousin's house. She further stated she was waiting on 12 cards, and that 12 times 5,000 would be 60,000. She also told R.C. that she only wanted to do claims using the PII of inmates that had "a long time," by which she meant inmates with long sentences were preferable

because they would not be released soon and be able to confront her about their share of the claim proceeds.

19.  The defendant typically received and controlled the Way2Go debit cards on which the UI funds were loaded.  On a recorded phone call on or about June 28, 2020, between the defendant, Hawkins, and Short, Hawkins asked the defendant how much the inmates were going to get and how they would be receiving the funds.  The defendant responded that she was going to be getting money orders and she was going to be giving the inmates between $4,500 and $5,000.  On a recorded phone call on or about July 8, 2020 between the defendant and R.C., the defendant told R.C. that she would have about 11 cards coming in and said that she would purchase money orders made payable to herself, sign someone else's name, and deposit them to her business account.  The defendant said that was the only way she would be able to move all the money orders.  On a recorded phone call on or about July 10, 2020, between Hawkins and Short, Hawkins explained the defendant was taking "taxes" so the inmates should expect less, but it should be at least "four."  Short asked Hawkins if he was still getting "two a head" and Hawkins said not to worry and that Short would get his money.

20.  The defendant, Hawkins, Short, and DeLoatch agreed to share the proceeds of their UI scheme.  Short had multiple conversations with Hawkins about the distribution of UI funds.  On a recorded phone call on June 24, 2020, Hawkins that said that Short would be receiving $10,500 for his own claim, and then DeLoatch would have to do the rest of the weeks in July, meaning that Deloatch would file weekly recertifications of Short's eligibility.  Referring to the defendant, Hawkins said that "she" wanted $2,000 for filing Short's own UI claim.  The defendant retained larger amounts from the other inmate claims.  The defendant, Hawkins, DeLoatch, and Short also typically provided some of the money to the inmates

8

themselves or their designated friends or family, which occurred via transfers in the inmate prison trust system, called JPAY, or via cash or money orders. Typically, the defendant retained a larger amount from each claim than Hawkins, DeLoatch, Short, or the inmates themselves.

21. On a recorded phone call on June 25, 2020, Hawkins, Short and the defendant had a conversation regarding division of the UI proceeds. The defendant advised she was going to give Short $200 per inmate. She said she listed the inmates' former employers as barbers, but the "government opened up everything," so she did not want it to look "too far out." Later in the call, the defendant explained that she was going to file three claims from which Short would receive $800 of the proceeds.

22. In a series of recorded phone calls in or about November 2020, the defendant explained to R.C. that "they stopped your stuff" and the "cards" no longer worked. R.C. told her to "dump" and "get rid of" the cards, and the defendant responded that she had already done so. The defendant told R.C. that her acquaintance who had access to unemployment records told her that "they know about them being locked up." The defendant said that she was trying to erase everything from her phone related to her "setting up accounts." The defendant told R.C. that people might come to talk him; she advised him to say he did not know anything as he was locked up. The defendant said that she obtained a new iPhone.

23. In a voluntary interview with law enforcement at her home on April 28, 2021, the defendant, after initially denying any involvement in filing fraudulent UI claims, admitted that she filed fraudulent UI claims on behalf of inmates and at least two non-inmates. She said that Dedrion Short provided inmates' PII to Lemyron Hawkins, who provided the PII to her, and that she kept $5,000 of the proceeds from each claim. The defendant told agents that she gave the remainder of the proceeds to DeLoatch and Hawkins.

9

24. In addition to the claims she filed with PII of inmates at Buckingham and other VADOC facilities that Short provided, the defendant filed several other successful fraudulent claims using inmates' PII. As noted above, she filed two claims for inmates at Deerfield. Further, the defendant filed a fraudulent UI claim using the PII of D.N., an inmate at Lawrenceville Correctional Center in Lawrenceville, Virginia. The defendant stated in a recorded phone call to R.C. on or about July 8, 2020, that she "wasn't worried" about D.N. because he "had 70 years left" on his sentence, and would not be worried about what the defendant was doing when he got released. The defendant filed a UI claim on behalf of D.N. on the same day. This claim resulted in VEC approving approximately $14,782 in UI benefits and delivering a Way2Go debit card with UI funds, and later payment of LWA funds, to the defendant. No funds were recovered, resulting in approximately $14,782 in actual loss to VEC, which did not include any LWA funds.

25. In sum, the defendant filed approximately 24 unemployment claims using inmates' PII that were approved for the payment of approximately $375,722 in UI benefits to VADOC inmates who were not entitled to receive such benefits. The defendant also attempted additional fraudulent claims that were not approved by VEC. Once VEC realized the UI claims for were VADOC inmates, VEC was able to claw back some of the funds remaining on the debit cards, resulting in approximately $358,076 in actual loss to VEC. Multiple successful claims included the payment of LWA funds.

26. From in or about June 2020, through in or about November 2020, in the Eastern District of Virginia and elsewhere, the defendant, and others known and unknown, including Dedrion Short, Norman Deloatch, and Lemyron Hawkins, knowingly and intentionally combined, conspired, confederated, and agreed to commit mail fraud. Specifically, the

defendant and others known and unknown, including Short, Deloatch, and Hawkins, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, for the purpose of executing such scheme or artifice and attempting to do so, knowingly deposited and caused to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and knowingly caused to be delivered by mail and such private and commercial interstate carrier any matter and thing whatever according to the direction thereon and at the place at which it is directed to be delivered by the person to whom it is addressed, in violation of Title 18, United States Code, Section 1341. The aforementioned violations occurred in relation to, and involving a benefit authorized, transported, transmitted, transferred, disbursed, and paid in connection with a presidentially declared major disaster and emergency as those terms are defined in section 102 of the Stafford Act.

27. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

28. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: _____
E. Rebecca Gantt
Anthony C. Marek
Assistant United States Attorneys

12

After consulting with my attorney and pursuant to the plea agreement entered this day between the defendant, MEISHA THOMPSON, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
MEISHA THOMPSON

I am MEISHA THOMPSON's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

_____
George Holton Yates, Esq.
Attorney for MEISHA THOMPSON